Lisa M. Buckley
Joshua Zuckerberg
LaKeisha M.A. Caton
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Phone:  (212) 421-4100
Facsimile:  (212) 326-0806
E-mail:  lbuckley@pryorcashman.com
jzuckerberg@pryorcashman.com
lcaton@pryorcashman.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

JAMES BUCKLEY, RODNEY DAVIS, MARIO DI
FONZO, EDWARD L. DU BOIS, III, DON
FUHRMAN, WALTER MARTIN, MARK
NINEHOUSER, JOHNNY SMITH, and RICHARD
WELSH,

                     Plaintiffs,

        - against -

THE NATIONAL FOOTBALL LEAGUE,

                   Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

ECF
18 Civ. _____

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

-------------------------------------------------------------------- X

       Plaintiff JAMES BUCKLEY, RODNEY DAVIS, MARIO DI FONZO, EDWARD L.

DU BOIS, III, DON FUHRMAN, WALTER MARTIN, MARK NINEHOUSER, JOHNNY

SMITH, and RICHARD WELSH, by their attorneys Pryor Cashman LLP, hereby submit this

Complaint against Defendant THE NATIONAL FOOTBALL LEAGUE alleging as follows:

       1.      Plaintiffs James Buckley ("Buckley"), Rodney Davis ("Davis"), Mario Di Fonzo

("Di Fonzo"), Edward L. Du Bois, III ("Du Bois"), Don Fuhrman ("Fuhrman"), Walter Martin

("Martin"), Mark Ninehouser ("Ninehouser"), Johnny Smith ("Smith"), and Richard Welsh

("Welsh") (collectively, "Plaintiffs") bring this action against the National Football League

("NFL") for age discrimination under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"), the New York State Executive Law § 296 et seq. (the "New York State Human Rights Law"), and the Administrative Code of the City § 8-101 et seq. (the "New York City Human Rights Law"). Plaintiffs also seek to recover (i) unpaid wages for hours worked as required by the New York Labor Law; (ii) unpaid benefits to which they were entitled and did not receive as a result of their misclassification as independent contractors under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, et seq. (the "FLSA") and § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; and (iii) compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, and prejudgment interest.

## NATURE OF THE ACTION

2. Each of the 9 Plaintiffs had been employed by the NFL as a "security representative," or "SR," with tenures ranging from between 11 years and 49 years. The NFL hires and assigns one security representative to each of the NFL's 32 football teams to provide game day services, as well as stadium inspections, prescription drug audits, background checks, and investigative services, if the NFL so directs. There are two SRs, one in Las Vegas, and the other in Honolulu, who are not assigned to a team and primarily perform investigative services and background checks.

3. Plaintiffs Buckley, Du Bois, Fuhrman, Smith and Welsh are in their early 70s, and Plaintiffs Davis, Di Fonzo, Martin and Ninehouser are in their 60s. Prior to their wrongful terminations, the Plaintiffs collectively comprised roughly one third of the SR workforce and 75% of the SRs over the age of 60. They all are mentally fit, physically fit and vibrant. They suffer from no physical ailments or limitations that have, or would in the future, affect their job performance.

4.     Throughout their tenures, each of the Plaintiffs had developed excellent relationships with, and was highly regarded by the NFL's then-current security chiefs, as well as their respective team's security and administrative staffs, and stadium security personnel, with whom they had collaborated for many years.

5.     Before they began working for the NFL, each of the Plaintiffs had spent more than two decades in law enforcement, and worked his way up the ranks and into a senior position with a high level of responsibility. They all are security experts well versed in best practices for event and stadium security. Each of the Plaintiffs also is a licensed private investigator, which is a prerequisite for all NFL security representatives, and has extensive experience conducting investigations.

6.     When Jeff Miller, the NFL's now-former security chief, announced in May of 2016 that he was leaving, the NFL began searching for a replacement. In September of 2016, they finally hired Cathy Lanier ("Lanier"), formerly the Chief of Police of the Metropolitan Police Department of the District of Columbia ("MPD"), where according to press reports, she was wildly unpopular with the rank and file.

7.     On her arrival at the NFL, Lanier let it be known that she was the new sheriff in town. Almost immediately, rumors swirled that Lanier was planning to fire SRs, creating an atmosphere of fear and foreboding. But that was precisely her intention. Ruling by fear and intimidation is Lanier's "management" style.

8.     Lanier made no effort to get to know any of the Plaintiffs. She did not interact with them, walk the field with them, or ask them any questions. Lanier never visited Plaintiffs Buckley, Davis, Du Bois, Fuhrman, Martin, or Ninehouser on game days at their respective

stadiums. She did not even meet Plaintiffs Du Bois, Fuhrman, Martin, Ninehouser, or Smith until an NFL conference held in May of 2017, where she shook their hands and walked away.

9.     In April of 2017, Lanier proclaimed to the SRs that the NFL was "moving in a different direction" and told them that she was soliciting requests for proposals to fill the SR positions.

10.    The "RFP process" concocted by Lanier and the NFL was a sham, designed to give cover to what Lanier had already decided to do: fire the Plaintiffs because she deemed them too old, and then pretend that her "hiring" decisions were based on some objective criteria. But the evidence is overwhelming: "moving in a different direction" was code for illegal age discrimination.

11.    All of the Plaintiffs responded to Lanier's RFP. Unequivocally, each of them has the qualifications and experience for the job. But Lanier never even bothered to interview any of them for the SR positions they had held for many years, contact the references identified in their responses to the RFP, or consult with their respective teams' security or administrative staffs because she never had any intention of "hiring" them.

12.    The hatchet fell on July 20, 2017, when Lanier terminated the Plaintiffs. Lanier made clear to each of the Plaintiffs that his termination had nothing to do with his performance. She told each of them that he was being terminated because the NFL was moving in a different direction. Notably no SR under 60 years of age had been terminated.

13.    The replacements hired by Lanier do not have qualifications or experience that are superior to those of the Plaintiffs. They are, however, between 10 and 25 years younger than the Plaintiffs.

14.     To the extent that it is not glaringly obvious from the compelling circumstantial evidence that Lanier and the NFL engaged in unlawful age discrimination, and it is glaringly obvious, Lanier's admissions to her then-Director of Security, Michael Rahill, leave no doubt that the NFL terminated the Plaintiffs based on age.

15.     On July 20, 2017, the day Lanier terminated the Plaintiffs' employment, Mr. Rahill entered the office he shared with Lanier just around the time she was going to call Plaintiff Buckley to terminate him.  Mr. Rahill, who was new and unfamiliar with any of the SRs, asked Lanier why she was terminating Buckley. Lanier told Mr. Rahill that "everyone loves JB," but that 70 is too old to walk the stadium.

16.     Meanwhile, Plaintiff Buckley is an avid gym-goer and weight lifter, he has a second degree black belt in Karate, a brown belt in Tai Kwon Do, and celebrated his 70th birthday by doing shoulder shrugs with 600 pounds. Over the course of his 17-year employment with the NFL, Plaintiff Buckley has consistently demonstrated not only that he can walk, run and stand for hours on end with no difficulty, but also that he could run circles around much younger SRs.

17.     Mr. Rahill was stunned by Lanier's admission, and knowing that it is illegal to terminate employees based on age, did not wait to hear more. He walked out of the office without specifically asking Lanier why she either had terminated or was about to terminate the other Plaintiffs, all of whom also were in their 70s or 60s, and all of whom also are physically fit and had consistently demonstrated their ability to meet the physical demands of the position. But it is clear as day that Lanier terminated all of the Plaintiffs because they were over the age of 60.

18.     By terminating the Plaintiffs' employment, Lanier and the NFL violated federal, state, and local anti-discrimination laws because, notwithstanding the NFL's intentional

misclassification of the Plaintiffs as "independent contractors," the Plaintiffs and the other SRs are, in fact, employees. And, significantly this is not the first time that the NFL has misclassified employees as independent contractors.

19.     The NFL should be made to pay for its wrongful conduct and the wrongful conduct of Lanier, which, in addition to illegally depriving the Plaintiffs of their livelihoods with the NFL, robbed them of their opportunity to say goodbye to their colleagues at the NFL and their teams and stadium security personnel with whom they had worked for many years, and also caused the Plaintiffs to suffer humiliation. The conduct of Lanier and the NFL is egregious and warrants punitive damages.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Plaintiffs' claims under the ADEA, the FLSA, and ERISA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) because Defendant resides in this district.

## THE PARTIES

### James Buckley

22.     Plaintiff James Buckley just turned 74 years old and lives in New Jersey. He was 73 when the NFL wrongfully terminated his employment. Buckley has a Bachelor of Science degree in Public Safety Administration and a Master of Arts degree in Urban Education and Community Affairs.  For 30 years, he was a law enforcement officer with the Paterson, New Jersey Police Department, retiring as Captain of Detectives in the Major Crimes squad. For several years during this period of time, Buckley had also been assigned as a Task Force Supervisor with the United States Drug Enforcement Administration (New Jersey Division).

Buckley has been a licensed private investigator in New Jersey since 1997. He has a Secret Clearance from the Department of Homeland Security.

23.     Buckley was employed by the NFL as an SR for 17 years during which he was assigned to the New York Giants at MetLife Stadium in East Rutherford, New Jersey. In addition to regular Game Days, the NFL put Buckley in charge of various Event Security Services at more than 12 Super Bowls, two NFL International Games in London, England, and several NFL Drafts. He has conducted numerous Best Practices Stadium Security Inspections throughout his 17-year career with the NFL, and has been entrusted to conduct those inspections at his own stadium, Met Life, which was virtually unheard of. Buckley has never missed an assigned game, be it pre-season, regular season, a Championship game, an International game, or a Super Bowl. Buckley is in excellent physical condition.

### Rodney Davis

24.     Plaintiff Rodney Davis is 68 years old and lives in New York. He is a college graduate, and for 29 years, Davis was a Special Agent and Supervisory Special Agent for the Federal Bureau of Investigation.  At the time he started with the FBI at the age of 23, Davis was the 66th African American Agent in FBI history. Davis is a licensed private investigator in New York, and still maintains a Secret Clearance with the FBI.

25.     For 14 years, Davis was employed by the NFL as an SR assigned to the New York Jets at MetLife Stadium in East Rutherford, New Jersey. In addition to working Game Days during the regular season, the NFL put Davis in charge of various Event Security Services at eight Pro Bowls, five NFL Drafts, two Super Bowls, one Playoff Game, and one NFL International game in London, England. During his tenure with the NFL, Davis had an instrumental role in the "Spy-Gate" investigation of a New England Patriots employee caught intercepting and videotaping signals given by New York Jets coaches to players. The Spy-Gate

incident led to the development of "Fair Competition Inspections" implemented by the NFL. He also assisted in developing the NFL Best Practices for Stadium Security. Davis regularly works out at the gym and is in excellent physical condition.

**Mario Di Fonzo**

26.     Plaintiff Mario Di Fonzo is 65 years old and lives in Maryland. He has a Bachelor of Science degree in Criminal Justice. For 22 years, Di Fonzo was a law enforcement officer with the Baltimore, Maryland Police Department, retiring as a Sergeant. After retiring from the Baltimore P.D., Di Fonzo began working for the Baltimore County Deputy Sheriff's Office, and has been there for the past 22 years. Di Fonzo is licensed as a private investigator in Maryland.

27.     Di Fonzo had been employed by the NFL for 15 years—first, as an Associate Security Representative for seven years, and then as a Security Representative for eight years. During this time, he was assigned to the Baltimore Ravens at M&T Bank Stadium in Baltimore, Maryland.   In addition to working regular Game Days, the NFL put Di Fonzo in charge of various Event Security Services at one Super Bowl, one AFC Championship Game, five Divisional or Wild Card Playoffs, and one Pro Bowl.   He also was involved in the planning and implementation of the NFL Kickoff Celebration held in Baltimore's Inner Harbor at the start of the 2013 football season. Di Fonzo served on a panel to develop initiatives to combat the sale of counterfeit tickets in Baltimore, which was hosted by the Baltimore Ravens and the Baltimore FBI, together with the Philadelphia FBI and Philadelphia Police Counterfeit Ticket Task Force. Di Fonzo exercises five days a week at a local gym and is in excellent physical condition.

**Edward Du Bois III**

28.     Plaintiff Edward Du Bois, III is 74 years old and lives in Florida. He has a Bachelor of Science degree in Business Administration. Du Bois is licensed as a private investigator in Florida and has worked as a special investigator for numerous law enforcement

agencies in South Florida, including the Miami-Dade State Attorney's Office, Miami-Dade

Police Department, Miami Police Department, Surfside Police Department, Bal Harbour Police

Department, Golden Bach Police Department, Bay Harbour Islands Police Department, North

Bay Village Police Department, Miami-Dade Schools Police, Hollywood Police Department,

Florida Board of Examiners, and the Florida Supreme Court.

29.      Du Bois was an NFL Security Representative for over 49 years and was assigned

to the Miami Dolphins at what is now called The Hard Rock Stadium located in Miami Gardens,

Florida. During his tenure, he has worked under every one of the NFL's security chiefs, three

NFL Commissioners, three Miami Dolphins owners, and every one of the Dolphins head

coaches. In addition to working as an SR on regular Game Days, Du Bois has been in charge of

various Event Security Services at 18 Super Bowls, two NFL International games in Mexico

City, three NFL International games at Wembley Stadium in London, and numerous Kickoff

games, Playoff games, and Pro Bowls. On his 25th anniversary, the NFL gave DuBois a gold

NFL watch in honor of his tenure. In fact, he has been dubbed as the "Face of the NFL." Du Bois

has performed investigation and security consulting for major league sports other than football,

including hockey, baseball, basketball, and auto racing. He is physically fit and exercises

regularly.

30.      Du Bois has been the subject of books, newspaper and magazine articles, and

news shows in connection with his investigation of the kidnapping and robbery of his client,

Mark Schiller. Du Bois provided the Miami Dade Police Department with the results of his

investigation which led to the arrest of the 11 criminals involved, two of whom are currently on

death row awaiting execution. In 2013, Du Bois' story, "Pain and Gain," based on the Schiller

9

case, was made into a major motion picture by Paramount Studios. The film, directed by Michael Bay and starring Ed Harris, Dwayne Johnson, and Mark Wahlberg, grossed over $100 million.

**Don Fuhrman**

31.     Plaintiff Don Fuhrman is 73 years old and lives in New York. He was 72 years old when the NFL wrongfully terminated his employment. Fuhrman attended State University of New York at Buffalo and Buffalo State College. For 20 years he was a New York State Police Trooper, Investigator and Senior Investigator. For another nine years, Fuhrman was an Investigator and Chief Investigator with the New York State Office of Inspector General. He is licensed as a private investigator in New York.

32.     For 21 years, Fuhrman was employed by the NFL, first as an Associate Security Representative for 2 years, and then as a Security Representative for 19 years. During this time, he was assigned to the Buffalo Bills at Ralph Wilson Stadium/New Era Field in Buffalo, New York. In addition to working as an NFL SR on regular Game Days, the NFL also put Fuhrman in charge of various Event Security Services at 13 Super Bowls, and he provided security oversight during the 10-day preparation for the Buffalo Bills game at Wembley Stadium in London, England. Additionally, he conducted numerous NFL Best Practices for Stadium Security Inspections and Rx Drug Audits. Fuhrman has run two marathons, the Buffalo City Marathon and the New York City Marathon, and for years, he has worked out seven days a week. He is in excellent physical condition.

**Walter Martin**

33.     Plaintiff Walter Martin is 61 years old and lives in Michigan. He has a Bachelor of Science degree in Political Science. Martin was a law enforcement officer with the Detroit, Michigan Police Department for 28 years where he worked his way up the ranks, retiring as the Assistant Chief of Police, a position in which he was responsible for overseeing all investigative

functions of the Department. Martin spent 12 years as a case investigator in the Internal Affairs division of the Department, and as the officer in charge of the Public Corruption Unit, where he supervised a team of six other investigators working high-level corruption cases jointly with the FBI and the U.S. Attorney's Office. Martin also had been designated as the lead law enforcement officer in charge of the 2006 Super Bowl, 2006 Major League Baseball All Star Game, and 2006 World Series (Detroit v. St. Louis), all of which had been held in Detroit.  He is licensed as a private investigator in Michigan.

34.     Martin was employed by the NFL for 11 years, first as an Associate Security Representative for nine years, then as a Security Representative for two years. During this time, he was assigned to the Detroit Lions at Ford Field Stadium in Detroit, Michigan. Martin is in excellent physical condition. He runs four days a week, lifts weights three times a week, and is a competitive bowler. Martin qualified for the Senior Olympics in bowling six years in a row.

**Mark Ninehouser**

35.     Plaintiff Mark Ninehouser is 68 years old and lives in Pennsylvania. He attended the Community College of Allegheny County and the University of Pittsburgh. Ninehouser was a law enforcement officer in the Pittsburgh, Pennsylvania Police Department for 29 years. He has also received many certificates for continuing education classes, seminars and training sessions on topics including terrorism and the use of bombs and explosives, and hostage negotiations. Ninehouser also has participated in disaster drills conducted by the Pittsburgh Department of Public Safety. He is licensed as a private investigator in Pennsylvania.

36.     Ninehouser was employed by the NFL as a Security Representative for 16 years, during which time he was assigned to the Pittsburgh Steelers at Heinz Field in Pittsburgh, Pennsylvania. During his 16 year tenure with the NFL, Ninehouser conducted 29 NFL Best

Practices Stadium Security Inspections and numerous Rx Drug Audits. In addition to working as an SR on regular Game Days, the NFL put Ninehouser in charge of various Event Security Services at six Super Bowls and one International game at Wembley Stadium in London, England. Ninehouser exercises regularly at his local gym and is in excellent physical condition.

### Johnny Smith

37.     Plaintiff Johnny Smith is 72 years old and lives in Nevada. He graduated from the University of Texas at El Paso with a Bachelor of Science degree in Business Administration. Smith was a Special Agent for the Federal Bureau of Investigation for 26 years. He has maintained a Top Secret Clearance with the federal government. Smith is licensed as a private investigator in Nevada. Since retiring from the FBI, Smith has worked as a contractor for several United States government agencies, including conducting Quality Assurance Inspections for Homeland Security, and background investigations for the Office of Personnel Management, National Security Agency, Bureau of Customs and Border Protection, Defense Security Service and FBI. Lanier's predecessor, Jeff Miller, thought so highly of Smith, that after leaving the NFL, Mr. Miller retained Smith to perform services for him at his new company.

38.     Smith was employed by the NFL for a total of 12 years—first as an Associate Security Representative for four years, and then for eight years as a Security Representative, but was not assigned to a team. During his tenure with the NFL, Smith developed and maintained, on behalf of the NFL, beneficial contacts with the FBI, U.S. Drug Enforcement Administration, U.S. Department of Homeland Security, U.S. Marshal, and U.S. Secret Service. Smith also developed and maintained contact with various members of the Las Vegas Metropolitan Police Department, Henderson Police Department, North Las Vegas Police Department and Boulder City Police Department. Smith is physically fit and has no physical ailments or limitations that have inhibited, or would inhibit, his ability to perform his duties in the future.

**Richard Welsh**

39.     Plaintiff Richard Welsh is 71 years old and lives in Maryland. He has a Bachelor of Science degree in Personnel Management from St. Johns University, as well as a Master of Arts degree in Personnel Administration from Central Michigan University. Welsh was a law enforcement officer in Prince George's County Police Department in Maryland for almost 28 years, retiring as a Major. During his 28 year career in law enforcement, Welsh also acted as Captain/Commander of the: Prince George County Police Personnel, Community Relations, Training and Education, and Special Operations divisions. He had responsibility for the Emergency Services Team (SWAT), Executive Protection Detail, Tactical Section, Motors, Canine, Foot Patrol, Hostage Negotiations, and Accident Reconstruction. As Captain/Commander, Welsh was tasked with planning, organizing and staffing the Department's response to emergency and large-scale events. He worked in various capacities in the successful resolution of approximately 200 high-risk incidents, including hostage situations, active shooter incidents, and domestic violence.  Welsh is licensed as a private investigator in Maryland.

40.     Welsh was employed by the NFL for 13 years—first, as an Associate Security Representative for four and a half years, and then as a Security Representative for eight and a half years. During this time, he was assigned to the Washington Redskins at FedEx Field Stadium in Landover, Maryland. In addition to performing Security Services on Game Days, Welsh conducted 16 Best Practices for Stadium Security Inspections. Welsh exercises regularly and is physically fit.

41.     Defendant the NFL is a professional American football league with its corporate offices headquartered at 345 Park Avenue, New York, New York 10065.  The NFL employs over fifty employees at any one time.

## FACTS

### The Duties of an NFL Security Representative

42.     Defendant identifies itself a trade association made up of, and financed by, its 32 member teams. The NFL season format consists of a four-week preseason, a 17-week regular season and a 12-team single elimination playoff season, culminating in the Super Bowl.

43.     Each of the NFL's 32 member teams has an assigned NFL Security Representative (or "SR") and an Associate Security Representative.

44.     The SRs in Las Vegas, and in Honolulu are not assigned to teams, and primarily provide investigative services to the NFL.

45.     Football stadium security is multilayered. The stadiums and the member teams each have their own dedicated security staff, neither of which work for, or report to, the NFL. The security work performed by the SRs are essential to the NFL's operations. It is the SRs who are the "eyes and ears of the NFL" on the field and in the stadium.

46.     Plaintiffs Buckley, Davis, Di Fonzo, Du Bois, Fuhrman, Martin, Ninehouser, Smith, and Welsh each had been employed by the NFL as Security Representatives. Their respective tenures with the NFL range from 11 years to 49 years. In addition to their lengthy, distinguished careers with the NFL, all of the Plaintiffs had decades-long distinguished careers in law enforcement.

47.     Plaintiffs Buckley, Du Bois, Fuhrman, Smith and Welsh are in their early 70s, and Plaintiffs Davis, Di Fonzo, Martin and Ninehouser are in their 60s. Prior to their unlawful terminations, Plaintiffs accounted for roughly one-third of the total number of NFL SRs, and 75% of the total number of NFL SRs in their 60s and 70s.

48.     During football season the SRs have "Game Day" responsibilities at their assigned team's home stadium. Throughout the year, the NFL may call upon its SRs to conduct

stadium security inspections, Rx drug audits, background checks, and/or confidential investigations. In all respects, the NFL had the right to control, direct and supervise the SRs.

49.     On Game Days, SRs are instructed to arrive at the stadium several hours before kickoff, and are not permitted to leave the stadium until all of the visiting team's buses are off the premises, after which they meet with stadium security personnel to gather statistics regarding arrests, ejections, weapons, bags checked, and other notable instances/events that may have occurred during the game. The NFL's SRs typically work between 12 and 14 hours on regular Game Days.

50.     The "NFL Best Practices for Stadium Security" specifies the tasks that the SRs are required to perform on Game Days, and it also dictates the way in which the SRs are required to perform them. Preparation for Game Days begins during the week prior to each home game. Pursuant to the NFL Best Practices for Stadium Security, Security Representatives' Game Day duties included, but were not limited to: (i) contacting the visiting team's director of security or designated individual in order to obtain their travel itinerary, lodging location, times of flight arrival/departure, schedules while within the location, and other pertinent information relating to their visit; (ii) contacting Game Day officials relative to their travel schedules/lodging; (iii) facilitating the arrival, security and departure of Game Day officials, visiting teams and their owners; (iv) inspecting both teams' locker rooms for safety; (v) monitoring the arrival of game footballs and participating in, recording and reporting game football air pressure; (vi) meeting with local, state and federal law enforcement regarding any known or perceived threats to the stadium; (vii) meeting with stadium security personnel regarding staffing at security posts; (viii) meeting with MSA K-9 personnel for assignments; (ix) accounting for assigned portable radios via sign-in sheet; (x) facilitating and conducting 100 minute security meeting with Game Day

officials, local, state, and federal law enforcement, stadium security personnel, visiting team security personnel, and home team security personnel, to review evacuation procedures and stoppage of game in the event of any unusual incident; (xi) observing the conduct of thousands of fans during the game, and departing from the stadium; (xii) ensuring proper deployment of security personnel both inside and outside the stadium; (xiii) liaising with local, state and federal law enforcement; (xiv) liaising with stadium personnel, players, coaches, team administrative staff and team owners (pre-post game); and (xv) coordinating the security activities with the Integrated Operations Center (IOC).

51.     When performing Game Day services, the NFL's SRs communicate with the command post manned by an NFL supervisor, law enforcement, fire, and emergency management personnel who monitor radio communications, CCTV monitors, and telephone communications, and when necessary, direct law enforcement and stadium security personnel to handle field matters.

52.     In addition, the NFL Best Practices for Stadium Security requires that the SRs prepare a Game Day Report right after the game, apprising the NFL of the number of arrests, ejections, weapons, bags checked, and other notable instances and events that may have occurred during the game. SRs also must prepare a separate report regarding the Fair Competition and Ball Inflation inspection and results. All reports are entered directly into the NFL Case Management System (known as "SARAX"). SRs typically work between 12 and 14 hours on regular Game Days.

53.     The NFL Best Practices for Stadium Security Inspections requires that SRs conduct periodic inspections of all of the football stadiums. The SRs are not permitted to conduct inspections at their own assigned stadiums, but are assigned to conduct inspections at stadiums

16

assigned to other SRs. In addition to conducting the inspections, the NFL also requires the SRs to conduct a post-inspection briefing and prepare an inspection report.

54.     The NFL assigns SRs to conduct "Rx Drug Audits" to verify that the medical staffs of the member clubs were properly accounting for the prescription drugs they were dispensing, and that proper security measures were followed in connection with the storage of those drugs.

55.     The NFL assigns SRs to conduct "Fair Competition Inspections" which require that the SRs accept a shipment of electronic testing equipment, arrange the safekeeping and delivery of equipment, facilitate the access of the inspectors to the stadium, and escort the inspectors while inside the stadium.

56.     The NFL assigns SRs to monitor the inflation of footballs used in the games, and then prepare a report.

57.     In addition to Game Day responsibilities, as SRs, Plaintiffs were also responsible for conducting pre-employment background checks, security inspections, and criminal investigations, as directed and monitored by the NFL, and for providing advice and coordination of investigative and security activities for the physical protection of NFL players, team and League personnel and their families.

**The NFL Misclassified the SRs as Independent Contractors**

58.     The NFL misclassified each of the Plaintiffs as "independent contractors," when in fact, they are employees.

59.     Specifically, the NFL currently has, and at all times during the Plaintiffs' respective tenures had, the right to direct, control and supervise the SRs in all aspects of their duties, and in many respects, micromanaged its SRs.

17

60.     The NFL Best Practices for Stadium Security dictates the work the SRs are required to perform on Game Days, and the manner in which the SRs are required to perform the work.

61.     The NFL Best Practices for Stadium Security Inspections dictates how the SRs are to conduct stadium security inspections, and the manner in which the SRs are required to perform the work.

62.     The NFL dictates how the SRs are to conduct Rx Drug Audits and the manner in which the SRs are required to perform the work.

63.     The NFL dictates how the SRs are required to conduct Fair Competition Inspections, and the manner in which the SRs are required to perform them.

64.     The NFL SRs do not have autonomy in the means and methods of performing their work.

65.     The NFL dictates how the SRs are to conduct Ball Inflation Inspections, and the manner in which the SRs are required to perform them.

66.     Even with respect to confidential investigations, SRs have little to no autonomy or discretion as to the manner in which they performed their services. For example, when assigning investigations, the NFL dictates the investigative steps to be taken by the SRs, rather than imbue the SRs' with the discretion to choose which steps he or she believes should be taken to accomplish the investigative goal.

67.     The NFL requires the SRs to participate in training sessions, as and when directed.

68.     The NFL requires SRs to comply with its general policies.

69.     The NFL requires SRs to submit to, and pass, background checks.

18

70.     The NFL dictates the apparel that the SRs can and cannot wear when doing NFL business.

71.     The NFL dictates the manner in which SRs are required to conduct themselves when doing NFL business.

72.     The NFL provides identification cards to the SRs that bear the NFL logo and identify the SRs as representatives of the NFL.

73.     The NFL pays for the equipment utilized by the SRs in performing their duties.

74.     The NFL reimburses the SRs for their expenses.

75.     The services provided by the SRs are services that the NFL is required to provide.

76.     The SRs are NFL employees.

77.     Notably, this is not the first time that the NFL has misclassified employees as Independent Contractors. In <u>Richardson v. National Football League</u>, *et al*, Docket No.: 1:07-cv-11632 filed in the United States District Court for the Southern District of New York in 2008, plaintiff urine testers sued the NFL for age discrimination in terminating their employment and violations of the Fair Labor Standards Act. According to the complaint, the plaintiffs had sought and obtained a determination by the United States Internal Revenue Service that the NFL misclassified them as "independent contractors" when, in fact, they were employees. The factors considered by the IRS in determining whether a worker is an independent contractor or employee largely mirror the factors considered by New York courts. After taking some swipes at the complaint on technical grounds, the NFL entered into a confidential settlement agreement with the plaintiffs.

78.     Here, too, the NFL has not only engaged in unlawful age discrimination by misclassifying the SRs as "independent contractors," upon information and belief, the NFL also

has cheated SRs, and perhaps other misclassified employees, out of wages and other benefits to which they are entitled in violation of the FLSA and the New York Labor Law. And, upon further information and belief, the NFL has cheated the United States government and one or more state governments out of millions of tax dollars by misclassifying the SRs.

79.     Plaintiffs regularly worked over 10 hours a day. Nevertheless, the NFL willfully failed to pay them an additional hour of pay as the spread of hours premium in violation of the New York Labor Law and the "spread of hours" and overtime wage orders of the New York State Department of Labor codified at N.Y. COMP. CODES R. & REGS. Tit. 12, Part 137.

80.     Upon information and belief, the NFL also willfully disregarded and purposefully evaded the recordkeeping requirements of the New York Labor Law by neglecting to maintain accurate and complete timesheets and payroll records for Plaintiffs.

81.     The NFL failed to (i) provide Plaintiffs with proper wage statements with every payment of wages, and (ii) provide Plaintiffs with a Notice and Acknowledgment of Pay Rate and Payday as required by the New York Labor Law.

**The Discriminatory Termination of Plaintiffs' Employment**

82.     Throughout their tenures with the NFL, each of the Plaintiffs had been highly regarded and valued by their superiors in the NFL, including former chief security officers, Messrs. Milt Ahlerich and Jeff Miller, as well as their respective teams, team's security and administrative staffs, and stadium security personnel, with whom they had coordinated for many years, and with whom they had built a great deal of confidence and trust.

83.     Messrs. Ahlerich and Miller were neither coy nor reticent to mete out criticism when they thought it was warranted. Upon information and belief, if either Mr. Ahlerich or Mr. Miller had a complaint about one of the Plaintiffs, he would have heard about it. But, in point of fact, none of the Plaintiffs had received a single complaint about their respective job

performance, or their ability to meet the physical demands of the position. Year in, and year out, each of the Plaintiffs performed his responsibilities exceptionally well, and demonstrated his ability to endure long periods of standing, walking and working outdoors, including in inclement weather. They all are more than capable of continuing to meet those physical demands.

84.     In May of 2016, Mr. Miller announced that he was leaving the NFL for a position elsewhere, and finally in September of 2016, Lanier was hired to replace him.

85.     Notwithstanding that this was a new job for her in a new line of work, Lanier made no effort whatsoever to get to know any of the Plaintiffs, or learn what exactly it is that they do and how they do it, even though they were among the most senior and most experienced NFL SRs.

86.     Lanier had never visited Plaintiffs Buckley, Di Fonzo, Du Bois, Fuhrman, Martin, or Ninehouser on Game Days at their respective stadiums. Five of the Plaintiffs—Du Bois, Fuhrman, Martin, Ninehouser or Smith—she had not even met until May of 2017 at an NFL conference. Even then, all she did was shake their hands and walk away.

87.     Lanier did visit Plaintiff Welsh at one Washington Redskins game at FedEx Field. Their interaction was extremely limited. Lanier did not walk the field with Welsh, or ask to be introduced to the team owner, team administrative staff, stadium security personnel, or law enforcement. First and foremost, Lanier asked Welsh for help finding her parking spot. Her only other interaction with Plaintiff Welsh that day was to try to show him that he was wrong when he told her that the Redskins would not give her a copy of their proprietary Emergency Operations Plan on a thumb drive as she had commanded. But he was right and she was wrong. It appears that Lanier did not understand that the football team organizations do not work for her, or the NFL. Actually, it's the opposite.

88.     Lanier attended one New York Jets game at Plaintiff Davis' stadium, but the extent of her interaction with him concerned her parking spot and food. She also had shown up to a Baltimore Ravens game at Plaintiff Di Fonzo's stadium, during which she had minimal interaction with him. Lanier did not walk the field with Plaintiffs Davis or Di Fonzo, or ask to be introduced to the team owner, team administrative staff, stadium security personnel, or law enforcement.

89.     It was not long before Lanier made her first overt power play, showing that she is in charge.  In what is believed to have been her first official act, in April of 2017, Lanier announced to the SRs that the NFL was "moving in a different direction," and that she would be soliciting proposals for all of the SR positions.

90.     In other words, the incumbent SRs who wished to continue their employment with the NFL would have to reapply for their positions. But no matter how many times she was asked, Lanier never answered the burning question: in what "different direction" was the NFL supposedly moving?  Apparently, she did not wish to tell Plaintiffs outright that the different direction was "younger."

91.     Despite smelling a rat in the form of Lanier's RFP, Plaintiffs had enjoyed their jobs with the NFL and wished to keep them. Thus, they each responded by the May deadline.

**The Request for Proposals**

92.     The RFP specified the qualifications and experience that were necessary for the SR position. Responses to the RFP required the submission of a "résumé to include relevant work history, qualifications, training and professional affiliations," "evidence of ability to obtain" Comprehensive General Liability Insurance and Professional Liability Insurance issued by a "U.S. insurance company rated by A.M. Best as A-, VII or better," as well as a "list of three client references."

93.    Second, the RFP required evidence of: (i) a current Private Investigator's license, (ii) "a minimum of 15 years of law enforcement experience (federal, state, county or local law enforcement), or equivalent experience in private investigations with a professional sports league," (iii) "current knowledge of security best practices and the latest security technology, preferably with an emphasis on large scale events or stadium/venue security," and (iv) "recent experience in conducting long-term, sophisticated criminal investigations; writing reports, and testifying in court."

94.    Next, the RFP required "attestation" that the responder possesses "the tools and equipment necessary to efficiently service the contract and perform the role of an independent security consultant," "[c]urrent contracts or access to data mining tools (e.g. Lexis, TLO, Accurint, etc.)," and "[p]roficiency in Microsoft Office (Outlook, Word, Excel, and Power Point), Adobe Acrobat, and Social Media."

95.    Further, the RFP required that the responder have the ability to: (i) "successfully pass an annual background check, to include criminal history, social media and civil checks/credit history," (ii) "work on a specific project or task, without extended periods of absence from your business," (iii) travel (10-25% of the time), including on short notices; and (iv) work extended hours, including evenings, weekends and holidays.

96.    Whereas, the foregoing qualifications were mandatory, the RFP also identified skills and experience that, while not required, would be "favorably considered." Specifically, the NFL would favorably consider a college degree; a graduate or MBA degree; foreign language proficiency; current technical expertise in the area of access control, video surveillance, CCTV, and physical security technology; and completion of projects or assignments related to professional sports or the entertainment industry.

97.    Finally, the RFP identifies the "physical demands" of the position as including "long periods of standing, walking and working outdoors, potentially while in inclement weather."

**The Plaintiffs Have the Qualifications and Experience Specified in the RFP**

98.    Each of the Plaintiffs submitted a timely response to Lanier's RFP which contained their respective résumés, copies of their certificates evidencing their Comprehensive General Liability Insurance and Professional Liability Insurance issued by a U.S. insurance company rated by A. M. Best as A-, VII or better, copies of their current private investigator licenses, and list of three client references.

99.    Further, each of the Plaintiffs possesses the qualifications and experience specified in the RFP. In addition to their "current knowledge of security best practices and the latest security technology . . . with an emphasis on large scale events or stadium/venue security" gained over their many years of employment with the NFL, each of the Plaintiffs also possesses the requisite: (i) number of years in local, state or federal law enforcement; (ii) number of years of experience in private investigations with a professional sports league; and (iii) expertise in the NFL's Best Practices.

100.    Moreover, each of the Plaintiffs attested to his (i) ability to pass an annual background check; (ii) access to data mining tools; (iii) possession of the requisite video surveillance equipment; (iv) proficiency with the specified computer programs; (v) availability on short notice, including for travel; and (vi) ability to work extended hours, including in the evenings, and on weekends and holidays.

101.    All of the Plaintiffs attended college and two of them have graduate degrees.

102.    Each of the Plaintiffs has current technical expertise in access control, video surveillance, CCTV, and physical security technology.

103.    Each of the Plaintiffs has completed projects or assignments related to professional sports or the entertainment industry.

104.    Over the course their respective tenures with the NFL, each of the Plaintiffs consistently has demonstrated his "ability to stand, walk and work outdoors for extended periods of time, including in inclement weather" as provided in the RFP.

**The Plaintiffs' Younger Replacements**

105.    The replacement SRs hired by Lanier to take the Plaintiffs' jobs are no more experienced or qualified than the Plaintiffs and, upon information and belief, some are less so. Certainly, none of the replacements had one or more decades of experience working as SRs for the NFL, or expertise in NFL Best Practices for Stadium Security.

106.    Moreover, upon information and belief, one or more of the replacements lacked one or more of the mandatory requirements for the SR position.  For example, publicly available records, showed that none of the replacements had the required private investigator license at the time they were hired. Tellingly, however, the Plaintiffs' replacements are between 10 and 25 years younger than the Plaintiffs.

107.    Plaintiff Buckley's replacement is believed to be 12 years his junior.

108.    Plaintiff Davis's replacement is believed to be 12 years his junior.

109.    Plaintiff Di Fonzo's replacement is believed to be 10 years his junior.

110.    Plaintiff Du Bois's replacement is believed to be 25 years his junior.

111.    Plaintiff Fuhrman's replacement is believed to be 23 years his junior.

112.    Plaintiff Martin's replacement is believed to be 10 years his junior.

113.    Plaintiff Ninehouser's replacement is believed to be 14 years his junior.

114.    Plaintiff Smith's replacement is believed to be 16 years his junior.

115.    Plaintiff Welsh's replacement is believed to be 18 years his junior.

116.    Plaintiffs' replacements are not paid lower wages.

117.    Moreover, upon information and belief, every SR under the age of 60 who responded to the RFP was "hired," and no SR under the age of 60 was terminated.

**Lanier Terminates Plaintiffs**

118.    On July 20, 2017, each of the Plaintiffs separately received a telephone call from Lanier, and her underling, Lenny Bandy, terminating his employment, effective August 11, 2017. Not surprisingly, each of the Plaintiffs asked Lanier why he was being terminated. Lanier assured all of the Plaintiffs that their terminations were not performance based. At least that much is true.

119.    Indeed, the odds that 9 SRs—comprising 75% of NFL SRs over 60—all turned in a substandard performance are infinitesimal, particularly considering Plaintiffs' lengthy tenures with the NFL. It used to be that the NFL did not suffer fools gladly. There is no way that Plaintiffs could have lasted with the NFL for 11, 12, 13, 14, 15, 16, 17, 21 or 49 years if their performances were less than exemplary, or if they were unable to meet the physical demands of the job.

120.    Lanier, for her part, certainly had no first-hand basis upon which to evaluate Plaintiffs' job performance, or their ability to meet the physical demands of the SR positon. She had never even observed any of the Plaintiffs performing their duties on Game Days. Lanier was not interested in evaluating Plaintiffs' job performance because no matter how well they had performed during all of the years that they had been employed by the NFL, and no matter how physically capable, she had already decided to fire them because of their age.

121.    Lanier did not ask Plaintiffs' respective teams whether or not they wished to keep their SRs. To the extent that Lanier had asked any of the Plaintiffs' respective teams to review

them, she ignored the reviews because, upon information and belief, the reviews all were extremely favorable.

122.   Indeed, upon information and belief, the Plaintiffs' respective teams learned about the terminations only after the fact, at which time they expressed extreme displeasure. When some of the Plaintiffs' teams had asked Lanier to reconsider, she refused, stating that she made her decision.

123.   To the extent that it is manifest from the compelling circumstantial evidence that Lanier and the NFL engaged in unlawful age discrimination, and it is, Lanier admitted to her then-Director of Security, Michael Rahill, that the terminations were based on age.

124.   More specifically, in or around June of 2017, Lanier hired Mr. Rahill, a former CIA agent, as an NFL Director of Security with responsibility over the Eastern seaboard. For some time, Mr. Rahill had shared an office with Lanier.

125.   On July 20, 2017, the day Lanier terminated the Plaintiffs' employment, Mr. Rahill entered the office he shared with Lanier right before she was going to call Plaintiff Buckley to terminate him. Mr. Rahill, who was new and unfamiliar with any of the SRs, asked Lanier why she was terminating Buckley. Lanier told Mr. Rahill that "everyone loves JB," but that 70 is too old to walk the stadium.

126.   Mr. Rahill was stunned by Lanier's admission, because he knows that it is illegal to terminate employees based on age. Mr. Rahill walked out of the office without specifically inquiring of Lanier why she terminated the other Plaintiffs, all of whom also were in their 70s or 60s. But it's clear that Lanier terminated all of the Plaintiffs based on their ages.

127.   By terminating the Plaintiffs' employment, Lanier and the NFL violated federal, state and local anti-discrimination laws because, notwithstanding the NFL's intentional

misclassification of the Plaintiffs as "independent contractors," the Plaintiffs and the other SRs are, in fact, employees. And, notably, this is not the first time that the NFL has misclassified employees as independent contractors.

128.   Plaintiffs each filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on or about November 15, 2017 alleging that the NFL discriminated against them on the basis of their age.

129.   On February 23, 2018, the EEOC issued each Plaintiff a right to sue letter at their behest.

**FIRST CAUSE OF ACTION**
**(Violation of the ADEA)**

130.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

131.   At all relevant times, Plaintiffs were each an "employee" under the ADEA, 29 U.S.C. § 630(f).

132.   Defendant is an "employer" under the ADEA, 29 U.S.C. § 630(b).

133.   Plaintiff Buckley is 74 years old; Plaintiff Davis is 68 years old; Plaintiff Di Fonzo is 65 years old; Plaintiff Du Bois is 74 years old; Plaintiff Fuhrman is 73 years old; Plaintiff Martin is 61 years old; Plaintiff Ninehouser is 68 years old; Plaintiff Smith is 72 years old; and Plaintiff Welsh is 71 years old.

134.   Plaintiffs unequivocally qualified for their positions.

135.   Despite Plaintiffs' qualifications and performance, Defendant unlawfully discriminated against them on the basis of their age.  Such discriminatory actions include the termination of their employment.

136.    Defendant's discriminatory conduct towards Plaintiffs constitute a willful violation of the ADEA, entitling Plaintiffs to liquidated damages, compensatory damages, punitive damages and attorney's fees.

137.    As a result of Defendant's discrimination, Plaintiffs have suffered substantial damages, including, but not limited to, lost past and future wages and benefits, emotional pain and suffering, and mental anguish, in an amount to be determined at trial, but not less than $10 million.

<b><u>SECOND CAUSE OF ACTION</u></b>
<b>(Age Discrimination under the New York State Human Rights Law)</b>

138.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

139.    At all relevant times, Plaintiffs were each a "person" and an "employee" of Defendant for purposes of §§ 292(1) and 292(6) of the New York State Human Rights Law.

140.    At all relevant times, Defendant was an "employer" for purposes of § 292(5) of the New York State Human Rights Law.

141.    By its actions as set forth herein, Defendant unlawfully discriminated against Plaintiffs on the basis of their age.  Such discriminatory actions include the termination of their employment.

142.    As a result of Defendant's discrimination, Plaintiffs have suffered substantial damages, including but not limited to, lost past and future wages and benefits, emotional pain and suffering, and mental anguish, in an amount to be determined at trial, but not less than $10 million, as well as attorney's fees and punitive damages.

## THIRD CAUSE OF ACTION
### (Age Discrimination under the New York City Human Rights Law)

143.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

144.    Plaintiffs are each a "person" under § 8-102(1) of the New York City Human Rights Law.

145.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

146.    By its actions as set forth herein, Defendant unlawfully discriminated against Plaintiffs on the basis of their age. Such discriminatory actions include the termination of their employment.

147.    As a result of Defendant's discrimination, Plaintiffs have suffered substantial damages, including, but not limited to, lost past and future wages and benefits, emotional pain and suffering, and mental anguish, in an amount to be determined at trial, but not less than $10 million, as well as attorney's fees and punitive damages.

148.    Defendant's discriminatory conduct was taken with malice and/or reckless indifference to Plaintiffs' rights, entitling Plaintiffs to punitive damages under the New York City Human Rights Law.

## FOURTH CAUSE OF ACTION
### (Violation of the New York Labor Law's Spread of Hours Provisions)

149.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

150.    Defendant failed to pay Plaintiffs one additional hour's pay at the basic minimum wage rate for each day Plaintiffs' spread of hours exceeded ten hours in violation of §§ 190 et

seq. and 650 et seq. and the wage order of the New York State Department of Labor codified at N.Y. Comp. Codes R. and Regs. Title 12, §§ 137-1.7 and 137-3.11.

151.    Defendant's failure to pay Plaintiffs an additional hour's pay for each day Plaintiffs' spread of hours exceeded ten hours was willful.

152.    As a result of Defendant's unlawful conduct, Plaintiffs are entitled to an award of damages pursuant to § 663(1) of the New York Labor Law in an amount to be determined at trial including unpaid compensation, liquidated damages, and costs and attorneys' fees.

## FIFTH CAUSE OF ACTION
### (Violation of the Wage Theft Prevention Act, New York Labor Law § 195)

153.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

154.    Defendant failed to provide Plaintiffs with a Notice and Acknowledgment of Pay Rate and Payday as required by the Wage Theft Prevention Act, New York Labor Law § 195.

155.    Defendant also failed to provide Plaintiffs with proper wage statements with every payment of wages in violation of the Wage Theft Prevention Act, New York Labor Law § 195.

156.    Defendant's violation of the Wage Theft Prevention Act, New York Labor Law § 195 as described herein was willful.

157.    As a result of Defendant's unlawful conduct, Plaintiffs are entitled to an award of damages pursuant to § 198 of the New York Labor Law in an amount to be determined at trial including unpaid compensation, liquidated damages, and costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Misclassification in Violation of the FLSA)

158.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

159.    At all relevant times, Defendant was an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

160.    At all relevant times, Defendant employed Plaintiffs within the meaning of the FLSA.

161.    Defendant failed to provide Plaintiffs with benefits to which they were entitled as a result of Defendant's willful misclassification of Plaintiffs.

162.    As a result of Defendant's unlawful conduct, Plaintiffs are entitled to an award of damages pursuant to 29 U.S.C. § 216(b) in an amount to be determined at trial including unpaid benefits, liquidated damages, and costs and attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**(For Pension Benefits Under ERISA)**

163.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

164.    Defendant made misrepresentations to Plaintiffs that they were not NFL employees and misclassified them thus depriving them of employee pension benefits to which they were entitled.

165.    As employees of Defendant, Plaintiffs were eligible to participate in all of the employee pension benefit plans sponsored by Defendant.

166.    The exhaustion requirement would be futile here as Defendant has maintained that Plaintiffs were never employees of Defendant and therefore, upon information and belief, Defendant does not intend to pay Plaintiffs benefits under the employee pension plans.

167.    Pursuant to 29 U.S.C. § 1132, Plaintiffs seek damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION
### (For Welfare Benefits Under ERISA)

168.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

169.    Defendant made misrepresentations to Plaintiffs that they were not NFL employees and misclassified them thus depriving them of employee welfare benefits to which they were entitled.

170.    As employees of Defendant, Plaintiffs were eligible to participate in all of the employee welfare benefit plans sponsored by Defendant including, but not limited to, group medical, dental, disability, and accident insurance.

171.    The exhaustion requirement would be futile here as Defendant has maintained that Plaintiffs were never employees of Defendant and therefore, upon information and belief, Defendant does not intend to pay Plaintiffs benefits under the employee welfare benefit plans.

172.    Pursuant to 29 U.S.C. §1132, Plaintiffs seek damages in an amount to be determined at trial including civil penalties and costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant:

        a.      awarding Plaintiffs damages in an amount to be determined at trial for all benefits to which they were entitled but did not receive as a result of their misclassification as independent contractors, including, but not limited to, pension and welfare benefits, and all costs incurred as a result of Plaintiffs obtaining benefits on their own;

b. declaring that the practices complained of herein are unlawful under the ADEA, the New York State Human Rights Law, and the New York City Human Rights Law, and that Defendant must cease and desist from its discriminatory practices;

c. declaring that the practices complained of herein are unlawful under the FLSA and the New York Labor Law;

d. awarding Plaintiffs damages for unpaid spread of hours pay and for Defendant's violation of the Wage Theft Prevention Act;

e. awarding Plaintiffs their actual damages in an amount to be determined at trial for back pay, front pay or reinstatement, and lost benefits;

f. awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

g. awarding pre-judgment and post-judgment interest as applicable;

h. awarding Plaintiffs the expenses incurred in this action, including costs and attorneys' fees; and

i. all such other and further relief as this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 16, 2018
   New York, New York

       PRYOR CASHMAN LLP


       By: /s/ Lisa M. Buckley
         Lisa M. Buckley
         Joshua Zuckerberg
         LaKeisha M.A. Caton

7 Times Square
New York, New York 10036
Phone: (212) 421-4100
Facsimile: (212) 326-0806
E-mail: lbuckley@pryorcashman.com
jzuckerberg@pryorcashman.com
lcaton@pryorcashman.com